UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| DONNA M. GILBERT, JULIE MOHNEY, CHARMAINE WHITE FACE, and others similarly situated,<br><br>            Plaintiffs,<br><br>vs.<br><br>RADM MICHAEL D. WEAHKEE, Principal Deputy Director of Indian Health Service (IHS); JAMES DRIVING HAWK, Great Plains IHS Area Director; and WILLIAM BARR, United States Attorney General,<br><br>            Defendants. | CIV. 19-5045-JLV<br><br><br>ORDER |

## INTRODUCTION

Plaintiffs, Native Americans residing in Rapid City, South Dakota, bring this action challenging the decision of the Indian Health Service ("IHS") to enter into a self-determination contract with the Great Plains Tribal Chairmen's Health Board ("the Health Board"). (Docket 5). The contract permits the Health Board to operate portions of IHS's facilities in Rapid City, including the Sioux San hospital, now known as the Oyate Health Center. Plaintiffs assert the contract violates the Fort Laramie Treaty of 1868 between the United States and the Great Sioux Nation and the Indian Self-Determination and Education Assistance Act ("ISDEAA"). They ask the court to enjoin the contract and reinstate IHS control over the Rapid City facilities. Also pending before the

court are plaintiffs' motions for class certification and summary judgment. (Dockets 12 & 37).

Defendants moved to dismiss the complaint. (Docket 16). They argue plaintiffs lack standing, failed to join indispensable parties, failed to state a viable treaty claim, and do not merit injunctive relief. (Docket 17). Defendants also oppose class certification and assert summary judgment is inappropriate. (Dockets 34, 39 & 41).

As detailed below, the court finds plaintiffs do not have zone-of-interest standing to sue for relief under the ISDEAA, the Fort Laramie Treaty does not provide a private right of action under these circumstances, and the Health Board is an indispensable party that cannot be joined due to sovereign immunity. The court dismisses the complaint, denies injunctive relief and denies all other pending motions as moot.

## I.    Legal Standards

Pursuant to Federal Rule of Civil Procedure 12(b), defendants challenge the court's subject matter jurisdiction, the complaint's sufficiency and joinder. The court recites the standards governing each challenge in turn.

Under Rule 12(b)(1), defendants have the right to challenge the "lack of subject-matter jurisdiction . . . ." Fed. R. Civ. P. 12(b)(1). "In deciding a motion under Rule 12(b)(1), the district court must distinguish between a facial attack—where it looks only to the face of the pleadings—and a factual attack— where it may consider matters outside the pleading." Croyle v. United States,

2

908 F.3d 377, 380 (8th Cir. 2018). "In a factual attack, the non-moving party does not have the benefit of [Rule] 12(b)(6) safeguards." Id. (internal quotations omitted). "[T]he party invoking federal jurisdiction must prove jurisdictional facts by a preponderance of the evidence." Moss v. United States, 895 F.3d 1091, 1097 (8th Cir. 2018).

Rule 12(b)(6) allows the court to dismiss a complaint for "failure to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). Two "working principles" underlie Rule 12(b)(6) analysis. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). First, courts are not required to accept as true legal conclusions "couched as . . . factual allegation[s]" in the complaint. Id. "[A] complaint must allege 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.' " Torti v. Hoag, 868 F.3d 666, 671 (8th Cir. 2017) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). The court does, however, "take the plaintiff's factual allegations as true." Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 594 (8th Cir. 2009). Second, the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679. The complaint is analyzed "as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." Braden, 588 F.3d at 594.

Finally, Rule 12(b)(7) permits dismissal for "failure to join a party under Rule 19." Fed. R. Civ. P. 12(b)(7). "Rule 19(a) defines required party,

and Rule 19(b) provides factors to consider to determine whether dismissal is required when joinder of such a party cannot feasibly be accomplished." <u>Two Shields v. Wilkinson</u>, 790 F.3d 791, 794 (8th Cir. 2015) (quotation and alteration omitted).   A party is required if:

(A)   in that person's absence, the court cannot accord complete relief among existing parties; or

(B)   that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

(i)   as a practical matter impair or impede the person's ability to protect the interest; or

(ii)   leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1).   The court must join a required party if personal jurisdiction over the required party exists and joinder will not "deprive the court of subject-matter jurisdiction."   <u>Id.</u>

"Rule 19(b) authorizes a district court to exercise its equitable powers to dismiss an action if a party regarded as 'indispensable' cannot be joined." <u>Spirit Lake Tribe v. North Dakota</u>, 262 F.3d 732, 746 (8th Cir. 2001).   Rule 19(b) provides the following factors for consideration in this inquiry:

(1)   the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;

(2)   the extent to which any prejudice could be lessened or avoided by:

(A)   protective provisions in the judgment;

(B)   shaping the relief; or

4

(C)   other measures;

(3)   whether a judgment rendered in the person's absence would be adequate; and

(4)   whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Fed. R. Civ. P. 19(b).

In the specific context of an immune sovereign entity that is a required party not amenable to suit, the Supreme Court has explained that the action must be dismissed if the claims of sovereign immunity are not frivolous and "there is a potential for injury to the interests of the absent sovereign."

Two Shields, 790 F.3d at 798 (quoting Republic of the Philippines v. Pimentel, 553 U.S. 851, 867 (2008)).

## II.   Facts

Defendants challenge the complaint on multiple grounds, some of which involve factual questions underpinning the court's subject matter jurisdiction. Accordingly, the court finds defendants are factually attacking the complaint and considers matters outside the pleadings.[1]   Croyle, 908 F.3d at 380.

On April 29, 1868, the United States entered into the Treaty of Fort Laramie with the bands of the Great Sioux Nation in an attempt to end warfare on the Northern Plains caused by an influx of American settlers onto tribal

---

[1]The court finds the materials cited in this order are also generally embraced by the complaint.   See Zean v. Fairview Health Servs., 858 F.3d 520, 526 (8th Cir. 2017) (holding materials embraced by the complaint—"documents whose contents are alleged in a complaint and whose authenticity no party questions"—may be considered in a Rule 12 motion to dismiss) (internal quotation omitted).

lands.    15 Stat. 635 (1868); <u>see</u> <u>also</u> <u>United States v. Sioux Nation of Indians</u>, 448 U.S. 371, 374-84 (1980).    In the treaty, the United States agreed to provide a physician to the Sioux people. 15 Stat. 635, arts. IV & XIII.    The United States made similar promises to numerous tribal nations as part of its efforts to secure tribal lands for its westward expansion.    <u>See</u> U.S. Comm'n on Civil Rights, <u>Broken Promises: Continuing Federal Funding Shortfall for Native Americans</u>, 61 (2018).[2]  These treaty provisions have evolved into a general federal obligation to provide health care to Native Americans.    <u>Id.</u>   Today, the federal government "declares that it is the policy of this Nation, in fulfillment of its special trust responsibility and legal obligations to Indians to ensure the highest possible health status for Indians and . . . to provide all resources necessary to effect that policy[.]"   25 U.S.C. § 1602(1).

The modern Great Sioux Nation is composed of multiple descendant tribal nations.    Three of those nations, the Oglala Sioux Tribe ("OST"), the Cheyenne River Sioux Tribe ("CRST"), and the Rosebud Sioux Tribe ("RST") reside on reservations in central and western South Dakota.    Many of their citizens reside in Rapid City.    To serve the Native American population of Rapid City, IHS established the Rapid City Service Unit.    (Docket 18-10 at p. 2).    According to IHS, 79.18 percent of the Rapid City Service Unit's patients are members of the OST, CRST or RST.    (Docket 18-10 at p. 2).    The Interior

---

[2]The report is available at https://www.usccr.gov/pubs/2018/12-20-Broken-Promises.pdf.

Board of Indian Appeals ("IBIA") held in 1997 that the OST, CRST, and RST could authorize a separate tribal organization to assume IHS functions in the Rapid City Service Unit.[3]  Rapid City Indian Health Bd., Inc. v. Dir., Aberdeen Area Office, Indian Health Serv., IBIA 97-100-A, 4-8 (1997).[4]

Tribal nations located in the Dakotas, Iowa and Nebraska organized the Health Board "to make known the needs and desires of the Indian people for assistance of the [IHS] in formulating programs and establishing priorities in delivering services which it is incumbent upon the United States to provide pursuant to the solemn treaty and legal obligations to the Indian people." (Docket 18-12 at pp. 4-5, 8).  The Health Board is incorporated as a nonprofit corporation under South Dakota law.  Id. at pp. 1-2.  The OST, CRST and RST are all members of the Health Board.  Id. at pp. 4-5.

In 2018, the three tribes authorized the Health Board to enter into a self-determination contract with IHS for the purposes of assuming the functions of the Rapid City Service Unit.  White Face v. Church et al., Civ. 18-5087 (Dockets 16-1 – 16-3) (D.S.D. Dec. 12, 2018).  Each authorization provided it would only take effect if the other two tribes also enacted authorizations.  Id. Using the authority granted by the three tribes, the Health Board transmitted its assumption proposal to IHS on September 26.  White Face (Docket 16-5).

---

[3]The IBIA has jurisdiction over partial or full denials of self-determination contracts under the ISDEAA.  25 C.F.R. §§ 900.31, 900.150, 900.152.

[4]A copy of the IBIA's decision is filed at docket entry 18-13.

In accordance with the ISDEAA's 90-day limit for considering a self-determination proposal, IHS responded it would accept or decline the proposal by December 26. White Face (Docket 16-6).

On December 4, Charmaine White Face, a named plaintiff in this case, filed suit against Jerrilyn Church, the Health Board's CEO, and James Driving Hawk, the IHS area director responsible for the Rapid City Service Unit. White Face (Docket 1). Ms. White Face requested a preliminary injunction to halt acceptance of the Health Board's proposal. White Face (Dockets 1 & 8). Ms. Church and Mr. Driving Hawk moved to dismiss the complaint. White Face (Dockets 13 & 14). The court held a hearing on Ms. White Face's motion on December 13 and dismissed the complaint for lack of subject matter jurisdiction. White Face (Dockets 27 & 31 at pp. 60-64). The court found the Health Board was entitled to tribal sovereign immunity, Ms. White Face lacked standing, and the OST, CRST and RST were indispensable parties who were not named in the complaint. White Face (Dockets 30 & 31 at pp. 60-64).

On December 18, the RST rescinded its authorization. (Docket 18-1 at pp. 5, 10). IHS canceled negotiations on December 20 and denied the Health Board's proposal on December 21. (Dockets 18-2 at pp. 1-2 & 18-3). The IHS concluded the RST's rescission invalidated the OST's and CRST's authorizations, leaving the Health Board unable to assume the Rapid City Service Unit's functions. (Docket 18-3 at pp. 5-7). To the court's knowledge, the Health Board did not administratively appeal the denial or challenge it in

8

federal court.   See 25 U.S.C. § 5321(b)(3) (permitting tribes or tribal organizations to administratively appeal proposal denial or sue in federal district court).

In January 2019, the OST and CRST, acknowledging the RST's change of heart, amended their prior authorizations to remove the requirement that all three tribes consent to the Health Board's assumption of IHS functions. (Dockets 18-5 at pp. 1-3 & 18-6 at pp. 1-4).   The Health Board returned to IHS on February 14 with a new proposal to assume functions at the Rapid City Service Unit on behalf of the OST and CRST only.   (Docket 18-4).   IHS and the Health Board negotiated aspects of the proposal in April and May of 2019. (Docket 18-8 at ¶ 3).   IHS officials consulted with tribal members from each of the three tribes and employees of the Rapid City Service Unit during the negotiation process.   Id. at ¶¶ 4-5.   IHS officials communicated with plaintiffs Donna Gilbert and Ms. White Face during the consultation process.   Id. at ¶¶ 5g, i, j & *l*.

On May 31, IHS and the Health Board entered into a contract permitting assumption of the Rapid City Service Unit on behalf of the OST and CRST. (Docket 18-9).   On June 1, IHS granted in part and denied in part the Health Board's proposal.[5]   (Docket 18-10).   The declined portions of the proposal

---

[5]In a footnote in its partial denial letter, IHS stated it was informed by CRST authorities on May 29 that the tribe intended to hold a referendum on its authorization.   (Docket 18-10 at p. 4 n.6).   The record contains no further information as to whether a referendum occurred or is presently scheduled. To the best of the court's knowledge, the CRST's authorization is still in effect.

related to certain types of costs and the provision of oncology and alternative medicine services. Id. at pp. 9-21. As reflected in the final contract, the vast majority of the Health Board's proposal was accepted.

The contract went into effect on July 21. (Dockets 18-10 at § 2.2 & 18-8 at ¶ 7). The Rapid City Service Unit is currently operated jointly between the Health Board and IHS. (Docket 18-8 at ¶ 7). The Health Board ostensibly provides services to OST and CRST citizens, while IHS serves RST citizens and citizens of other tribes. Id. However, IHS represents that both it and the Health Board have an "open-door" policy whereby they will each serve Native Americans from any tribe. Id.

Two of the named plaintiffs, Ms. Gilbert and Julie Mohney, submitted affidavits detailing their experiences during the assumption process.[6] Ms. Gilbert stated she refused to sign an Intergovernmental Personnel Act ("IPA") agreement which would enable her to continue work at the Rapid City Service Unit under the Health Board's management.[7] (Docket 20 at p. 3). On December 17, 2018, Ms. Gilbert received a termination notice. (Docket 20-3).

---

[6]Ms. White Face did not file an affidavit. The court found in the case she filed as sole plaintiff that she did not have standing to represent Rapid City Service Unit employees. White Face (Docket 31 at pp. 62-63). To the best of the court's knowledge, Ms. White Face is not employed at the Service Unit.

[7]According to an e-mail sent by Ms. Church to Rapid City Service Unit employees, the Health Board "intend[ed] to offer each eligible employee . . . the opportunity to continue in federal employment" through IPAs and other mechanisms. (Docket 20-5). Ineligible employees would be offered direct employment with the Health Board. Id.

Because the Health Board's first attempt to enter into a self-determination contract was denied, Ms. Gilbert's termination notice was rescinded. (Docket 20-13). In June of 2019, Ms. Gilbert was offered "one of the 35 federal jobs they were keeping[.]" (Docket 20 at p. 5). She does not state whether she accepted the job or whether she is still employed at the Rapid City Service Unit.

Ms. Mohney states she was "release[d] from employment with the [IHS]" on August 6, 2019. (Docket 21 at p. 1). She does not explain why she was terminated or whether it was connected to the assumption process. Ms. Mohney alleges "had the appropriate procedures and lawful practices been followed by the I.H.S. in this matter, [she] would still be employed with the I.H.S." but does not elaborate further. Id. at p. 2.

Plaintiffs filed affidavits from ten members of the Rapid City Native American community who all allege the assumption harmed them in some way.[8] (Dockets 22 – 29). Approximately 167 individuals, presumably members of the Rapid City Native American community and patients of the Rapid City Service Unit, consented to be part of a class action. (Dockets 12-1 & 30). These putative class members did not provide any individualized information about themselves or their connection to the Service Unit.

---

[8]Three of the affidavits are filed as attachments to a separate affidavit. (Docket 26-1 at pp. 43-50).

## III.   Analysis

Defendants assert the complaint should be dismissed for the following

reasons:

1.   Plaintiffs lack standing to challenge the Health Board's
     assumption of the Rapid City Service Unit's functions.
     (Docket 17 at pp. 10-14).

2.   Plaintiffs' treaty claim fails to state a claim upon which relief
     can be granted.   Id. at pp. 14-16.

3.   Plaintiffs failed to join the Health Board, OST and CRST,
     which are indispensable parties protected by sovereign
     immunity.   Id. at pp. 16-18.

4.   The court "should not interfere" with the assumption
     contract.   Id. at pp. 18-20.

Defendants also assert plaintiffs have not shown they are entitled to a

preliminary or permanent injunction.   Id. at pp. 22-26.

At the outset, the court notes defendants' fourth argument is more in the

nature of a policy brief setting forth facts about the ISDEAA and the particular

contract at issue in this case.   Id. at pp. 18-20.   It does not advance any

reason that the complaint should be dismissed.   The court will therefore not

address it in its analysis.   The other three arguments are addressed in turn.

### A.   ISDEAA zone-of-interests standing

Defendants assert plaintiffs do not have standing to assert a violation of

the ISDEAA on their own individual behalf or on the behalf of others.   (Docket

17 at pp. 10-14).   In support of their argument, they cite the well-established

12

standards governing constitutional standing.[9]  Id. at p. 10.   However,
defendants do not analyze whether each individual plaintiff has constitutional
standing, instead choosing to assert that only tribes and tribal organizations
may challenge ISDEAA violations.   Id. at pp. 10-12.

Determining whether each plaintiff has constitutional standing would
involve a more detailed factual inquiry than can be conducted on the present
record.   Nevertheless, even assuming plaintiffs have constitutional standing,
the court finds their alleged harms do not fall within the "zone of interests"
protected by the ISDEAA.   Plaintiffs' ISDEAA claims therefore cannot proceed.

"A plaintiff seeking to bring suit under a federal statute must show not
only that he has standing under Article III, but also that his complaint falls
within the zone of interests protected by the law he invokes[.]"   Bank of
America Corp. v. City of Miami, Fla., 137 S. Ct. 1296, 1307 (2017) (Thomas, J.
concurring in part and dissenting in part) (internal quotation omitted).   Courts
"presume that a statutory cause of action extends only to plaintiffs whose
interests fall within the zone of interests protected by the law invoked."
Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 129
(2014) (internal quotation omitted).   "[T]he breadth of the zone of interests

_____

[9]The court uses the term "constitutional standing" to signify the
"irreducible constitutional minimum of standing" mandated by Article III's case
or controversy requirement.   See Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-
61 (1992) (setting forth elements of "constitutional" standing).   Constitutional
standing is separate from the zone-of-interests analysis the court must
undertake to determine whether plaintiffs' alleged injuries are encompassed
within any right of action created by the ISDEAA.

varies according to the provisions of law at issue[.]"  Bennett v. Spear, 520 U.S. 154, 163 (1997).   "Whether a plaintiff comes within the zone of interests is an issue that requires [the court] to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim."   Lexmark, 572 U.S. at 127 (internal quotation omitted).

In the ISDEAA, Congress declared it is federal policy to establish "a meaningful Indian self-determination policy which will permit an orderly transition from the Federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services." 25 U.S.C. § 5302(b).   The ISDEAA accomplishes this goal by requiring federal officials to enter into a "self-determination contract" proposed by any tribe or "tribal organization" to assume the functions of certain federal agencies, including IHS.   Id. at §§ 5321(a)(1), (2).   The agency may only refuse a proposed self-determination contract for five specified reasons.   Id. at § 5321(a)(2).

The ISDEAA is generally concerned with contracts between federal agencies and tribes or tribal organizations.   It requires agencies to enter into contracts with eligible tribal entities.   25 U.S.C. § 5321(a) ("The Secretary is directed . . . to enter into a self-determination contract or contracts *with a tribal organization*[.]") (emphasis added).   The law's definition of "self-

14

determination contract" is limited to contracts "between a tribal organization and the appropriate Secretary[.]" Id. at § 5304(j). Congress did not evince in the ISDEAA any intent to allow individuals to enter into enforceable contracts with agencies.

The references to individuals in the ISDEAA are secondary to its goal of promoting self-determination contracts. For example, the ISDEAA provides that federal employees affected by a self-determination contract are entitled to continuity of their federal benefits under certain circumstances. Id. at § 5332(e). Individuals are also able to bring tort claims against employees of tribes or tribal organizations operating under a self-determination contract as if they were federal employees. Id. at § 5321(d); see also Act of Nov. 5, 1990, Pub. L. No. 101-5112, § 314, 104 Stat. 1915, 1959-60 (allowing claims against tribal employees to proceed under Federal Tort Claims Act).

The ISDEAA's seemingly-broad right of action provision does not open the courthouse doors to individual litigants concerned with self-determination contracts. The provision gives federal district courts "original jurisdiction over any civil action or claim . . . arising under" the ISDEAA. 25 U.S.C. § 5331(a). However, Congress specified in the provision that a federal court may order "injunctive relief" to force agencies "to award and fund an approved self-determination contract[.]" Id. This specification indicates a focus in the right of action on the ISDEAA's overarching goal—to enable tribes and tribal organizations to assume federal functions through self-determination

15

contracts.   The court finds Congress did not intend to "expressly negate[]" the traditional zone of interests analysis for courts evaluating the scope of the ISDEAA's right of action.[10]   Bennett, 520 U.S. at 163.

ISDEAA case law, while not specifically resolving whether individuals have a right of action to challenge self-determination contracts, does confirm the law is concerned primarily with interactions between tribes and federal agencies.   The United States Courts of Appeal for the Eighth, Ninth and Eleventh Circuits, as well as the Court of Federal Claims, have each held the ISDEAA does not permit private parties to sue for harms incurred pursuant to a self-determination contract.[11]   The Eighth Circuit found "by definition, the ISDEAA does not contemplate that a private party . . . can enter into a self-determination contract."   FGS, 64 F.3d at 1234 (referencing 25 U.S.C. § 5304(j)).

---

[10]The court notes the ISDEAA's private right of action is not a "citizen-suit" provision similar to those the Supreme Court has construed to "expand[] the zone of interests" for the purposes of enabling suit by private parties.   See Bennett, 520 U.S. at 163-66.

[11]See Colbert v. United States, 785 F.3d 1384, 1391 (11th Cir. 2015) (finding Federal Tort Claims Act coverage under ISDEAA only applicable when tortfeasor was employee of tribe or tribal organization, not a private party); Demontiney v. United States, 255 F.3d 801, 807 (9th Cir. 2001) (rejecting suit by private subcontractor for alleged breach of self-determination contract because ISDEAA does "not contemplate suits by private parties."); FGS Constructors, Inc. v. Carlow, 64 F.3d 1230, 1234-35 (8th Cir. 1995) (concluding private subcontractor was not an "Indian contractor" permitted to sue under ISDEAA for alleged breach of self-determination contract); Demontiney v. United States, 54 Fed. Cl. 780, 786 (2002).

Given the text and judicial interpretations of the ISDEAA, the court concludes its right of action does not encompass suits by individuals seeking to challenge a self-determination contract. The court finds plaintiffs, who seek to abrogate the contract between IHS and the Health Board, do not fall within the zone of interests protected by the ISDEAA. Nothing in the ISDEAA indicates Congress intended to permit individuals to interfere with self-determination contracts.

Plaintiffs' arguments against this conclusion are unpersuasive. They primarily assert the ISDEAA and its implementing regulations require defendants to secure "the consent of the Indian community to be served" by the proposed self-determination contract before acceptance. (Docket 19 at pp. 3-8). In plaintiffs' view, defendants' failure to gain the consent of the Rapid City Native American community "is grounds for enjoining the Defendants from enforcing" the contract. Id. at p. 7. Plaintiffs also take issue with the notion that consent of their tribal governments is sufficient to satisfy the ISDEAA, arguing that the tribes do not represent their interests in health care matters.[12] Id. at pp. 8-9.

---

[12]Plaintiffs argue the OST and CRST are legally unable to authorize self-determinations contracts involving IHS assets in Rapid City because the assets are not located within reservation boundaries. (Docket 19 at pp. 8-9). The IBIA explicitly rejected this argument in 1997 and plaintiffs have not directly challenged that ruling. Rapid City Indian Health Bd., IBIA 97-100-A, 4-8 (1997). The court accepts the IBIA ruling for the purposes of this case. In any event, plaintiffs, as individuals, have no standing to challenge the legality of the contract.

At the outset, it is not clear what section of the ISDEAA plaintiffs rely on. Plaintiffs cited no specific statutory provisions in their response brief. The statutory citations in plaintiffs' amended complaint are not illuminating. <u>See,</u> <u>e.g.</u> Docket 5 at pp. 1, 3 (citing "25 CFR 450(c)," which does not exist, for proposition that community support is needed for a self-determination contract). Plaintiffs cite regulatory policy statements which reiterate federal intent to "assur[e] maximum Indian participation" in service provision and to "facilitate and encourage Indian tribes" to enter into self-determination contracts. 25 C.F.R. §§ 900.3(a)(1), (b)(3). These policy statements do not require IHS to secure consent of the Rapid City Native American community before allowing the Health Board to assume IHS functions.

Plaintiffs do cite to § 103(D) of the public law creating the ISDEAA. (Docket 5 at p. 1, 3). That particular section does not exist, but § 103(A), as enacted in 1975, did require a federal agency to consider whether a contracting tribe or tribal organization "would be deficient in performance under the contract with respect to . . . community support for the contract" before awarding the contract. Indian Self-Determination Act, Pub. L. 93-638, § 103(A), 88 Stat. 2203, 2207 (1975). However, Congress repealed that section in 1988. Indian Self-Determination Amendments of 1987, Pub. L. No. 100-472, § 201(b)(1), 102 Stat. 2285, 2289 (1988). Today, agencies are not required to consider community support before awarding a proposed contract.

18

In fact, lack of community support is not one of the five specific reasons for which a contract may legally be denied. 25 U.S.C. § 5321(a)(2).

Plaintiffs also rely on the ISDEAA's definition of tribal organization. See Dockets 19 at pp. 6-7 & 37 at pp. 2-3 (reciting definition). Under the ISDEAA, a tribal organization is

> the recognized governing body of any Indian tribe; any legally established organization of Indians which is controlled, sanctioned, or chartered by such governing body or which is democratically elected by the adult members of the Indian community to be served by such organization and which includes the maximum participation of Indians in all phases of its activities[.]

Id. at § 5304(l). This definition, parsed out, creates three separate categories of tribal organizations:

1. "[T]he recognized governing body of any Indian tribe[.]" Id.

2. "[A]ny legally established organization of Indians which is controlled, sanctioned, or chartered by such governing body[,]" referring to "the recognized governing body of any Indian tribe[.]" Id.

3. "[A]ny legally established organization of Indians which is . . . democratically elected by the adult members of the Indian community to be served by such organization and which includes the maximum participation of Indians in all phases of its activities[.]" Id.

The statute defines each category in the disjunctive, signifying that an entity need only fit into one of the three categories to qualify as a tribal organization. Id.

Only the third category of tribal organization requires democratic participation by "the adult members of the Indian community to be served[.]" Id. If the Health Board fits into one of the other two categories of tribal

19

organization, democratic control is not required.   In this case, it is clear the Health Board falls within the second category of tribal organization: an entity "controlled, sanctioned, or chartered" by tribal governments.   <u>Id.</u>   The Health Board is an entity organized under South Dakota law controlled by 17 separate federally recognized tribes.   (Docket 18-12 at pp. 1-2, 4-5).   As it relates to the present self-determination contract, the Health Board is authorized by the OST and CRST, both federally recognized tribes, to assume IHS functions at the Rapid City Service Unit.   (Dockets 18-5 at pp. 1-3 & 18-6 at pp. 1-4). Accordingly, the ISDEAA does not require the Health Board to be democratically accountable to the Rapid City Native American community to qualify as a tribal organization able to enter into a self-determination contract.

Plaintiffs' argument that their interests are not represented by their tribal government fails for the same reason.   The ISDEAA does not require that tribal governments democratically represent the will of the population to be served before their consent to a self-determination contract is valid.   The ISDEAA only requires that a self-determination contract be authorized by "any Indian tribe by tribal resolution"—it does not specify how or whether the tribe should consult the population to be served.   25 U.S.C. § 5321(a)(1)

Plaintiffs did not establish that they fall within the zone of interests protected by the ISDEAA.   The ISDEAA's right of action does not encompass their suit to enjoin the self-determination contract between the IHS and the

Health Board.   Accordingly, the court dismisses plaintiffs' ISDEAA claim with prejudice.[13]

## B.    Treaty of Fort Laramie claim

Plaintiffs assert the self-determination contract contravenes the 1868 Treaty of Fort Laramie.   (Docket 5 at p. 3).   They argue the United States "agreed to provide health care for members of the Great Sioux Nation" and that "the responsibility of the United States to provide that health care is considerably diminished" by the self-determination contract.   Id.   Plaintiffs contend the United States violated the treaty by transferring its obligation to provide health care to the Health Board without their consent.   Id.

The legal nature of plaintiffs' treaty claim is not clear.   The court construes plaintiffs' complaint to contend the Treaty of Fort Laramie created a trust duty for defendants, as agents of the United States, to provide health care to the Great Sioux Nation.   Plaintiffs' claim, under this view, would then assert defendants breached that trust duty by contracting with the Health Board to provide care.   As with their ISDEAA claim, the court finds plaintiffs do not have standing as individuals to bring a treaty claim.

---

[13]Although defendants suggest dismissal should be pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction, see Docket 17 at p. 10, the Supreme Court has made clear the zone-of-interests standing test is not a jurisdictional inquiry.   Lexmark, 572 U.S. at 128 n.4.   Plaintiffs failed to state a viable ISDEAA claim and so the court dismisses it pursuant to Rule 12(b)(6). The court dismisses the claim with prejudice because plaintiffs, as individuals, cannot allege any facts that would permit them to sue for an alleged ISDEAA violation.

"A treaty is essentially a contract between two sovereign nations."

Herrera v. Wyoming, 139 S. Ct. 1686, 1699 (2019) (internal quotation omitted).

"[T]he existence of a trust relationship between the United States and an Indian

or Indian tribe includes as a fundamental incident the right of an injured

beneficiary to sue the trustee for damages resulting from a breach of the trust."

United States v. Mitchell, 463 U.S. 206, 226 (1983). "The existence of a trust

duty between the United States and an Indian or Indian tribe can be inferred

from the provisions of a statute, treaty or other agreement, 'reinforced by the

undisputed existence of a general trust relationship between the United States

and the Indian people.' " Blue Legs v. United States Bureau of Indian Affairs,

867 F.2d 1094, 1100 (8th Cir. 1989) (quoting Mitchell, 463 U.S. at 225). To

state a breach of trust claim, plaintiffs must "identify a substantive source of

law that establishes specific fiduciary or other duties, and allege that the

Government has failed faithfully to perform those duties." United States v.

Navajo Nation, 537 U.S. 488, 506 (2003).

Plaintiffs have not successfully stated a breach of trust claim as

individuals. As defendants point out, the Treaty of Fort Laramie was

negotiated between two sovereigns—the United States and the Great Sioux

Nation—not between the United States and individual Indians. (Docket 17 at

p. 15). The treaty provides, "[t]he United States hereby agrees to furnish

annually to the Indians the physician . . . as herein contemplated, and that

such appropriations shall be made from time to time, on the estimates of the

Secretary of the Interior, as will be sufficient to employ such persons."

15 Stat. 635, art. XIII.   Reading this language with a liberal construction in favor of plaintiffs' interests as Indians, the court cannot infer an enforceable trust duty as to individual Indians such as plaintiffs.[14]   See Herrera, 139 S. Ct. at 1699 (describing canon of construction requiring courts to interpret treaties in favor of the Indians).   Stated differently, plaintiffs have not shown the treaty—or any other source of law—creates an individual trust duty the United States breached by entering into a self-determination contract with the Health Board.

Plaintiffs' arguments to the contrary miss the mark.   They first point to examples of courts enforcing treaty rights in favor of individual Indians in fishing and hunting cases.   (Docket 19 at pp. 9-10) (citing Herrera, 139 S. Ct. 1686; State v. Tinno, 497 P.2d 1386 (Idaho 1972)).   But the affected persons in those cases were protected by individually enforceable treaty provisions guaranteeing the right to hunt or fish.   Here, the Treaty of Fort Laramie does not guarantee an individual Indian the right to health care provided by the United States, as opposed to a tribal organization.

---

[14]Whether the Treaty of Fort Laramie obligates the United States to provide health care to descendant tribes, as opposed to individuals, of the Great Sioux Nation is at issue in a case pending before the Central Division of this court.   See Rosebud Sioux Tribe v. United States, Civ. 16-3038, 2017 WL 1214418 at *6-9 (D.S.D. Mar. 31, 2017) (holding the RST stated a claim that the United States violated trust duty to provide adequate health care created by the Treaty of Fort Laramie and other statutes sufficient to survive motion to dismiss).   This case presents no occasion for the court to weigh in on that question.

Plaintiffs also assert Ms. White Face is the "Official Spokesperson for the 1894 Sioux Nation Treaty Council." (Docket 19 at p. 10). In that position, according to plaintiffs, Ms. White Face has the "duty and responsibility to protect and preserve all of the Articles and provisions of the Fort Laramie Treaty of 1868" and "undeniably has the authority necessary to speak on behalf of the Indian people and the Treaty." Id. at p. 11. Neither plaintiffs nor defendants provided the court with any information about the 1894 Sioux Nation Treaty Council.

Plaintiffs did not identify any basis for the court to consider the 1894 Sioux Nation Treaty Council as a descendant entity of the Great Sioux Nation. In comparison, the OST and CRST are federally recognized tribal nations. Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs, 84 Fed. Reg. 1200, 1201-02 (Feb. 1, 2019). The United States divided the Great Sioux Nation in 1889 as a method of acquiring more land for American settlement, segregating the OST and CRST onto separate reservations. Act of March 2, 1880, 25 Stat. 888, 888-89 (establishing Pine Ridge and Cheyenne River reservations). The OST and CRST organized as federally recognized tribal nations under the Indian Reorganization Act in 1935 and 1936, establishing their legal existence under American law.[15] The history of the OST and CRST make clear they are

_____

[15]See Constitution and By-Laws of the Cheyenne River Sioux Tribe of South Dakota, Dec. 27, 1935, Certificate of Adoption; Constitution and By-Laws of the Oglala Sioux Tribe of the Pine Ridge Reservation of South Dakota,

24

descendant entities of the Great Sioux Nation, while plaintiffs do not show the 1894 Sioux Nation Treaty Council is entitled to enforce the Treaty of Fort Laramie. On the present record, the court cannot accept Ms. White Face's assertion that she is entitled, as Spokesperson of the Treaty Council, to sue on behalf of the Great Sioux Nation.

Plaintiffs cannot sue as individuals to enforce the Treaty of Fort Laramie's provisions relating to health care. The court dismisses their treaty claim with prejudice for failure to state a claim upon which relief can be granted.[16] Fed. R. Civ. P. 12(b)(6).

### C. Joinder

Defendants' final argument in favor of dismissal is that plaintiffs failed to join the Health Board, OST and CRST. (Docket 17 at pp. 16-18). They assert the Health Board, as a party to the self-determination contract, would be directly impacted by this litigation. Id. at p. 17. Defendants also contend the litigation would "interfere with the rights" of the OST and CRST as sovereign tribal nations, presumably because the tribes authorized the contract. Id. Plaintiffs respond that the Health Board has no authority to enter into a self-determination contract because it "does not meet the qualifications to be

_____

Jan. 15, 1936, Certificate of Adoption.

[16]Plaintiffs' complaint also alleged the self-determination contract violated the Supremacy Clause and the Act of March 3rd, 1871. Docket 5 at p. 1; see also Act of March 3rd, 1871, 15 Stat. 544 (appropriating funding to fulfill treaty obligations). The court considers these claims as part of plaintiffs' treaty claim and dismisses them with prejudice.

designated as a Tribal Organization[,]" rendering it dispensable. (Docket 19 at p. 11; see also Docket 33 at pp. 2-4). The court finds the Health Board is an indispensable party that cannot be joined due to sovereign immunity, necessitating dismissal.[17]

An entity must be joined to an action if it "claims an interest relating to the subject of the action and is so situated that disposing of the action in the [entity's] absence may impair or impede the [entity's] ability to protect the interest[.]" Fed. R. Civ. P. 19(a)(1)(B)(i). Here, the Health Board has a vital interest in the self-determination contract that is the subject of this action. It is presently operating portions of the Rapid City Service Unit pursuant to the contract. Plaintiffs ask the court to cancel the contract, which would certainly "impair or impede" the Health Board's interest in the contract. The court finds the Health Board is indispensable to litigation concerning the present self-determination contract.

The court rejects plaintiffs' argument that the Health Board is not a tribal organization for ISDEAA purposes. As described above, see supra Section III.A, the Health Board is a consortium of 17 different tribes which is

---

[17]The court's finding that the Health Board is indispensable and cannot be joined obviates any need to conclusively determine whether the OST and CRST are also indispensable parties. In the White Face litigation, the court tentatively concluded the tribal nations were indispensable. White Face (Docket 31 at pp. 63-64). That conclusion was reached in the context of a temporary restraining order hearing on a rushed and limited factual record and is not binding authority. The court does not intend to foreclose argument as to the indispensability of the tribal nations in future ISDEAA litigation involving the Rapid City Service Unit.

specifically authorized by the OST and CRST to assume the functions of the Rapid City Service Unit.    A "legally established organization of Indians which is controlled, sanctioned, or chartered by" tribal nations is a tribal organization under the ISDEAA.    25 U.S.C. § 5304(*l*).    The Health Board fits squarely within that definition.[18]    Accordingly, it had the power to enter into a self-determination contract.    This litigation will impact the Health Board's valid interest in the contract, rendering the Health Board indispensable.

Having determined the Health Board is an indispensable party, the court must now consider whether it feasibly can be joined and, if it cannot be joined, whether this action should be dismissed.    Fed. R. Civ. P. 19(b).    The Health Board cannot feasibly be joined due to its sovereign immunity.    The Southern Division of this court held in 2012 that the Health Board is entitled to share in the sovereign immunity of its component tribal nations.    J.L. Ward Assocs., Inc. v. Great Plains Tribal Chairmen's Health Bd., 842 F. Supp. 2d 1163, 1171-77 (D.S.D. 2012).    Plaintiffs do not advance any reason why the court should not adhere to the reasoning in J.L. Ward and the court perceives none.[19]    Entities protected by tribal sovereign immunity may be sued "only if Congress has authorized the suit or the [entity] has waived its immunity," and nothing in

---

[18]Contrary to plaintiffs' argument, it does not matter that the Health Board is incorporated under state law, as opposed to tribal law.    (Docket 33 at pp. 2-4).    The ISDEAA's definition of tribal organization does not preclude state-chartered organizations.

[19]The court orally affirmed its adherence to J.L. Ward in the White Face litigation as well.    White Face (Docket 31 at p. 62).

the record indicates either condition is present in this case.   Stanko v. Oglala

Sioux Tribe, 916 F.3d 694, 696 (8th Cir. 2019).   The Health Board's immunity

from suit renders joinder infeasible in this case.

The Supreme Court and Eighth Circuit have both held that an action

must be dismissed when an indispensable party cannot be joined due to

sovereign immunity.   Pimentel, 553 U.S. at 867; Two Shields, 790 F.3d at 798.

These cases concerned the sovereign immunity of the Republic of the

Phillippines and the United States, respectively, not an "arm of the tribe" entity

entitled to tribal sovereign immunity such as the Health Board.   Whatever

import that distinction may have—and the court does not suggest there is any

import at all—the factors of Rule 19(b) counsel in favor of dismissal regardless.

The first factor, the "extent to which a judgment . . . might prejudice" the

absent party, weighs heavily in favor of dismissal.   Fed. R. Civ. P. 19(b)(1).   A

judgment in favor of plaintiffs would invalidate the self-determination contract,

in which the Health Board has a major interest.   As to the second factor, each

form of relief plaintiffs request would require the court to invalidate the self-

determination contract, so there is no possibility of shaping the judgment to

avoid prejudice to the Health Board.   Fed. R. Civ. P. 19(b)(2); see also Docket 5

at p. 5 (prayer for relief).

The third factor, whether a judgment made in the absence of the

indispensable party "would be adequate," does not weigh in favor of dismissal.

Fed. R. Civ. P. 19(b)(3).   It is true the court could render an adequate

judgment in the Health Board's absence, but the court cannot enter judgment in favor of plaintiffs for the substantive reasons given in this order. Finally, the court acknowledges plaintiffs may not have a judicial remedy if the court dismisses this action for lack of joinder. Fed. R. Civ. P. 19(b)(4). On December 4, 2018, the Oglala Sioux Tribal Court ruled it did not have jurisdiction over the Health Board. White Face v. Great Plains Tribal Chairmen's Health Bd., Civ. 18-409 (Oglala Sioux Tribal Ct. Dec. 4, 2018).[20] No party informed the court whether similar cases were brought in other tribal courts or in South Dakota state court. But the lack of a judicial remedy does not mean plaintiffs have no remedy at all. The RST already rescinded its authorization for the Health Board to assume the functions of the Rapid City Service Unit and it appears there is opposition to the OST's and CRST's assumption. Plaintiffs retain a political remedy through engagement with their tribal governments.

In any event, the Health Board's sovereign immunity and the impossibility of avoiding prejudice to the Health Board by proceeding with this litigation tip the scales in favor of dismissing this case for lack of joinder. The court dismisses plaintiff's complaint without prejudice under Rule 19(b).

**D.     Preliminary injunction**

Plaintiffs' complaint asked for an "immediate injunction" to halt the self-determination contract. (Docket 5 at p. 5). Defendants oppose injunctive

---

[20]A copy of the Tribal Court's order is filed at docket entry 19-3.

relief.   (Docket 17 at pp. 22-26).   Because plaintiffs cannot succeed on the merits, the court denies an injunction.

> Whether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.

> Dataphase Sys, Inc. v. CL Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981).

"In deciding whether to grant a preliminary injunction, likelihood of success on the merits is the most significant." Laclede Gas Co. v. St. Charles Cty., Mo., 713 F.3d 413, 419 (8th Cir. 2013) (internal quotation omitted).

The court dismisses plaintiffs' complaint for failure to state a claim and lack of joinder.   There is no likelihood plaintiffs will succeed on the merits.   As for the other factors, the court notes enjoining the self-determination contract will upend a carefully-negotiated arrangement that presently governs a health care facility serving thousands of patients, many of them indigent Native Americans with no other care options.   The balance of equities, in the court's view, favors defendants.   Moreover, Congress has declared that self-determination contracts are in the public's interest.   See 25 U.S.C. § 5302. These factors all weigh strongly against an injunction.

The court lastly considers the threat of irreparable harm to plaintiffs. "To succeed in demonstrating a threat of irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." Roudachevski v. All-American Care Centers, Inc., 648 F.3d 701, 706 (8th Cir. 2011) (internal quotation omitted).

30

In various filings, plaintiffs assert the self-determination contract cost IHS employees their jobs and worsened the quality of care provided to community members. See, e.g., Dockets 21, 24 & 27 (alleging jobs terminated due to contract); Dockets 22, 27 & 28 (alleging drop in quality of care). Even taking these allegations as true, they do not show certain and imminent harm of such magnitude as to outweigh the other factors counseling against enjoining the contract.[21]

## IV.   Conclusion

This case raises delicate questions about the role of the Rapid City Native American community in the governance of the Rapid City Service Unit. The court wishes to emphasize that this order holds only that individuals, such as plaintiffs, cannot challenge a self-governance contract under the ISDEAA or the Fort Laramie Treaty and that the Health Board is an indispensable party to any litigation concerning the particular contract at issue in this case. The RST's rescission of its prior authorization and the possibility the CRST will hold a referendum regarding its authorization indicate the unsettled status of the assumption process. The court expresses no view about potential other challenges to the self-determination contract by any of the three affected tribal nations.

---

[21]The Eighth Circuit has declined to require district courts to resolve "assertions of lack of jurisdiction" before considering a request for a preliminary injunction. Laclede Gas, 713 F.3d at 416-17. Having determined it must dismiss the complaint, the court considers itself bound to deny injunctive relief. The court nevertheless evaluates the Dataphase factors to avoid an incomplete ruling.

## ORDER

For the reasons given above, it is

ORDERED that defendants' motion to dismiss (Docket 16) is granted as described in this order. Plaintiffs' claims under the ISDEAA and the 1868 Treaty of Fort Laramie are dismissed with prejudice.

IT IS FURTHER ORDERED that plaintiffs' motion for class certification (Docket 12) and motion for summary judgment (Docket 37) are denied as moot.

IT IS FURTHER ORDERED that defendants' motions to strike (Dockets 34 & 41) are denied as moot.

Dated February 18, 2020.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
UNITED STATES DISTRICT JUDGE